

# The Attorney General of Texas

. M MATTOX
~itorney General

.preme Court Building
P. O. Box 12548
Austin, TX. 78711- 2548
2/475-2501
.lex 910/874-1367
Telecopier 512/475-0266

.4 Jackson, Suite 700
Dallas, TX. 75202-4508
214/742-8944

4824 Alberta Ave., Suite 160
El Paso, TX. 79905-2793
5/533-3484

901 Texas, Suite 700
ouston, TX. 77002-3111
13/223-5886

36 Broadway, Suite 312
Lubbock, TX. 79401-3479
806/747-5238

309 N. Tenth, Suite B
McAllen, TX. 78501-1685
12/682-4547

200 Main Plaza, Suite 400
San Antonio, TX. 78205-2797
12/225-4191

An Equal Opportunity/
Affirmative Action Employer

December 28, 1984

Honorable Lloyd Criss
Chairman
Committee on Labor and
   Employment Relations
Texas House of Representatives
P. O. Box 2910
Austin, Texas   78769

Opinion No. JM-282

Re: Use of construction manage-
ment contracts by state univer-
sities

Dear Representative Criss:

You have requested our opinion about the legality of a bidding
procedure used by one or more state universities to award construction
contracts. You describe the procedure as follows:

> (a) By formal advertising, general contracting
> firms are invited to bid on the fee and other
> rates they would charge to build the project based
> on a general project description. They are asked
> to bid on:

>> (1) A percentage fee based on project
>> costs;
>> (2) A bond rate;
>> (3) A savings ratio for dividing any
>> savings in job costs under the guaranteed
>> maximum price;
>> (4) A workmen's compensation insurance
>> rate; and
>> (5) An hourly rate for consulting services.

> (b) The fee and rate bids are evaluated in two
> steps:

>> (1) A set of predetermined units of measure
>> and a preset total cost are used to arrive at
>> the total dollar cost of the fee and commitment
>> of each bidder;

>> (2) A final evaluation is made based on
>> total dollar amount of the bid, contractors'
>> financial resources, surety and insurance

experience, construction experience, completion ability, personnel available, equipment available, work load, and client relationship.

(c) A contract is awarded based on the proposal most advantageous to the university after an evaluation of the bids. A contract is executed and bonds and insurance certificates are provided.

(d) The contractor begins doing preliminary consulting work with the designers of the project and prepares cost estimates as the design work progresses.

(e) As various phases of the plans are completed, the contractor obtains competitive subcontract bids. The contractor is not required to subcontract all of the work. The contractor may designate the portions of the work to be done by the contractor, and provides detailed estimates of the proposed cost of those portions. The university may accept the estimate or elect to take subcontract bids. Also, the university may require the contractor to perform preliminary construction work to be paid for on a time and material basis.

(f) The contractor then submits a guaranteed maximum price to the university. This price is based on the subcontract bids and the estimates of the portions of the work to be performed by the contractor. If the guaranteed maximum price is not acceptable, the contractor is paid only for its consulting work.

(g) If the maximum price is accepted, a work order is issued for the construction of the project. The project is then built and the contractor is paid all cost it incurs, plus the percentage fee and rates based on its original bid up to the amount of the guaranteed maximum price.

You have posed a number of specific questions about this procedure, all of which deal with the compatibility of the procedure with section 51.907 of the Texas Education Code. In order better to address your specific concerns, we will first discuss the matter generally.

Section 51.907 of the Texas Education Code was enacted in 1977. Acts 1977, 65th Leg., ch. 197, at 562.  It states in pertinent part:

> All contracts for the construction or erection of permanent improvements at an institution of higher education . . . are void unless made after advertising for bids thereon in a manner prescribed by its governing board, receiving sealed competitive bids, and awarding of the contract to the lowest responsible bidder by the governing body. . . . (Emphasis added).

It is important to distinguish between contracts for the construction or erection of a building and contracts for planning the construction and erection of it.  Only the former are within section 51.907.  Architectural services, engineering services, consultant services, and the manner of procuring them are controlled by other statutes.  See V.T.C.S. art. 664-4 (professional services); art. 6252-11c (private consultants).  In our opinion, the work to be done prior to the time a decision is to be made about who will engage in actual construction work (as contemplated by the procedure under review) consists of professional or consultant services not governed by section 51.907 of the Education Code.  Cf. Attorney General Opinion MW-530 (1982) ("construction manager").

Article 664-4, V.T.C.S., provides that no state agency "shall make any contract for, or engage the professional services of," any licensed architect or registered engineer "selected on the basis of competitive bids . . . , but shall select and award such contracts and engage such services on the basis of demonstrated competence and qualifications for the type of professional services to be performed" at fair and reasonable prices.  Any contracts, agreements, or arrangements for such services made directly or indirectly by any state agency in any way in violation of the statute are void. V.T.C.S. art. 664-4, §4.  Cf. State v. Steck, 236 S.W.2d 836 (Tex. Civ. App. - Austin 1951, writ ref'd).

Professional services, within the meaning of the above statute, include all those within the scope of laws defining such professional practices or those performed by any such licensed practitioner "in connection with his professional employment or practice."  V.T.C.S. art. 664-4, §2.  The practice of architecture is defined at article 249a, section 10(a), V.T.C.S.  The practice of engineering is defined at article 3271a, section 2(4), V.T.C.S.  Section 19 of article 3271a specifically makes it unlawful for the state to engage in the construction of any public work estimated to cost more than $3,000 and involving professional engineering (where public health, public welfare, or public safety is involved) unless the engineering plans and specifications and estimates are prepared by, and the engineering

construction is executed under, the direct supervision of a registered professional engineer.

The employment of other private consultants by state agencies is governed by article 6252-11c, V.T.C.S. The statute defines a consulting service as "the human service of studying or advising an agency under an independent contract." Id. §1(1). The act expressly does not apply to the employment of registered professional engineers or registered architects (1) for architectural or engineering studies or (2) for the design or construction of state facilities. Id. §2. But the act is applicable, in our opinion, to others employed as management consultants on the design or construction of state facilities. Cf. V.T.C.S. art. 601b, §3.01(b) ("services" includes skilled or unskilled labor or professional work).

The criteria for the use and selection of such a consultant by a state agency is set out in the third section of article 6252-11c. Subsection (3) of the first section includes four-year institutions of higher education within the definition of "state agency." Selections of private consultants are not to be made on the basis of competitive bids, but if the contract may be valued in excess of $10,000, the agency is required to invite offers publicly for consulting services. Id. §6(a). See Attorney General Opinion H-1173 (1978).

With those preliminary observations made, we can proceed to your specific questions, the first of which follows:

> 1. May the university solicit and receive competitive bids for construction of permanent improvements based on a general project description before plans and specifications are complete?

First making a distinction between bids for the construction of permanent improvements and offers to act as a management consultant regarding such construction, as above discussed, our answer is in the negative. A general project description of incomplete plans and specifications will not furnish a sufficient basis on which competitive bids for the construction of a project can be received pursuant to section 51.907 of the Education Code. As noted in Attorney General Opinion H-24 (1973), a procedure does not result in competitive bids where bid documents leave to conjecture requirements governing the bids and only by happenstance would all interested bidders arrive at a common conclusion regarding their meaning. See also Attorney General Opinion MW-299 (1981). In Sterrett v. Bell, 240 S.W.2d 516, 520 (Tex. Civ. App. - Dallas 1951, no writ), cited with approval in Texas Highway Commission v. Texas Association of Steel Importers, 372 S.W.2d 525 (Tex. 1963), it was said:

'Competitive bidding" requires due advertisement, giving opportunity to bid, and contemplates a bidding on the same undertaking upon each of the same material items covered by the contract; upon the same thing. It requires that all bidders be placed upon the same plane of equality and that they each bid upon the same terms and conditions involved in all the items and parts of the contract, and that the proposal specify as to all bids the same, or substantially similar specifications. . . . There can be no competitive bidding in a legal sense where the terms of the letting of the contract prevent or restrict competition, favor a contractor or materialman, or increase the cost of the work or of the materials or other items going into the project.'

Your second question asks:

(2) May the university award contracts on the basis of application of the bid items to predetermined units of measure not fully disclosed in the bid documents?

This question refers to the award of a consulting contract and not a construction contract under the postulated procedure, since it is intended to establish a price to be paid for consulting services whether or not the contractor's "guaranteed maximum price" to construct the facility is later accepted. Awards of such contracts are governed by articles 664-4 and 6252-11c, V.T.C.S., rather than section 51.907 of the Education Code. Those statutes do not prohibit the incidental use of such criteria in awarding such contracts.

Your third and sixth questions involve the "guaranteed maximum price" aspect of the procedure and will be considered together:

(3) May the university award a contract on the basis of cost plus a percentage fee with a guaranteed maximum price? Does it matter that the maximum price is agreed to without competitive bidding?

. . . .

(6) Are the competitive bidding statutes satisfied by the setting of a guaranteed maximum price for the construction of the project, rather than a fixed price?

The usual bidding procedure is one where a general contractor, having already made independent arrangements with any specialty contractors ("subcontractors") he intends to use, offers to build a contemplated facility for a fixed price. The owner, in that case, looks to the general contractor alone and usually has no direct control over the choice of subcontractors to be used on the project or the price paid them, and no control over the amount of profit built into the bid for the general contractor.

In contrast, the procedure at issue results in an arrangement similar to one where the owner of a project acts as his own general contractor, farming out various phases of the work directly to specialty contractors of his selection. Here, the "consultant" is expected to act somewhat as though he were the university's agent for that purpose, and the profit or "fee" of the "consultant/general contractor" remains in the control of the university unless it allows the consultant to do part of the actual construction, thus becoming a specialty contractor as well.

Notwithstanding the control this procedure gives the university, in his legal relationship with other specialty contractors the consultant/general contractor remains the only contractor to whom the university is under contractual obligation. In our opinion, the consultant/general contractor is the prime contractor to whom all the subcontractors are contractually bound and is not the agent of the university in dealing with subcontractors. Indicative of that relationship is the fact that the "consultant's" bond in favor of the university covers the subcontractors' work as well as his own. See Lytle v. McAlpin, 220 S.W.2d 216 (Tex. Civ. App. - San Antonio 1949, writ dism'd).

In such a setting, the "guaranteed maximum price" is substantially the same thing as a fixed price (from the university's standpoint) because it fixes the maximum amount the university is obligated to pay for the completed project, and if project cost exceeds that amount, the excess is absorbed by the consultant/general contractor. The fact that occurrence of certain contingencies will reduce the actual amount the university is required to pay does not change its character. See Black v. Phillip Miller Co., 14 P.2d 11 (Wash. 1932). Cf. Gay v. Stratton, 559 S.W.2d 131 (Tex. Civ. App. - Texarkana 1977, writ ref'd n.r.e.). However, the price contemplated by the particular arrangement here is a negotiated price for construction work -- not one determined by competitive bids as section 51.907 of the Education Code requires for construction work -- and is therefore impermissible.

In answer to your questions, then, in our opinion, a university may award a negotiated "consultant services" contract that provides for compensation to the consultant based upon a percentage of the total cost for a project with a guaranteed maximum, assuming that

other requirements of article 6252-11c, V.T.C.S., are met. And it may award a <u>construction</u> contract on the basis of a guaranteed maximum price with automatic reductions based upon specified and advertised contingencies, in our opinion, if the award is based upon competitive bids as required by section 51.907 of the Education Code. <u>See Texas Roofing Co. v. Whiteside</u>, 385 S.W.2d 699 (Tex. Civ. App. - Amarillo 1964, writ ref'd n.r.e.); <u>cf.</u> Attorney General Opinion MW-299 (1981). But it cannot award a "consultant services" contract on competitive bids in the section 51.907 sense, and it cannot negotiate a "construction" contract in the article 6252-11c or article 664-4 sense. Nor can the requirements of these statutes be avoided by soliciting both "consultant services" proposals and "construction" bids at the same time for inclusion in a single contract. <u>Cf. Kelly v. Cochran County</u>, 82 S.W.2d 641 (Tex. 1935) (separate contracts executed by county to avoid statutory requirements held void and subject to cancellation).

Contracts based upon bids made by subcontractors to a general contractor for incorporation in the price submitted by the general contractor to the owner (whether it be designated a "fixed price" or a "guaranteed maximum price") are not contracts on "competitive bids" within the meaning of section 51.907 of the Education Code, because they are not contracts made "after . . . receiving sealed competitive bids . . . <u>by the governing body</u>." The acceptance of a subcontract bid by the general contractor, acting not as <u>agent</u> for the university but on his own behalf (even though he allows the university a right of prior approval), creates a contract between the general contractor and the subcontractor -- to which the university is a stranger or, at best, merely a beneficiary. <u>See Texas Roofing Co. v. Whiteside</u>, <u>supra</u>; <u>Lytle v. McAlpin</u>, <u>supra</u>.

Only a competitive bid accepted by the governing board of the educational institution can be the basis of a construction contract authorized by section 51.907. For that reason, also, a construction contract based on a general contractor's "guaranteed maximum price" can be awarded only upon a competitive bid submitted in competition with other general contractors vying for the "guaranteed maximum price" contract. It is a misnomer, however, to refer to a contract for construction with a "guaranteed maximum price" as a "cost plus" contract, because the "guaranteed maximum" creates a risk of loss to the contractor that is absent in a true "cost plus" contract. <u>Cf. Sterrett v. Bell</u>, <u>supra</u>.

Your other two questions are:

> (4) May the university have some early con-
> struction work done on a project and pay for it on
> a time and materials basis?

> (5) May the university negotiate some of the
> work on a project with the general contractor
> without taking bids on that portion of the work?

Both these questions must be answered in the negative if a "time and materials basis" means an open-ended arrangement for pricing materials and labor, see LaVelle v. DeLuca, 180 N.W.2d 710 (Wis. 1970) (defining "time and materials basis"), and if the work is for the construction or erection of permanent improvements at an institution of higher education. Section 51.907 of the Education Code specifies that all contracts for such work are void unless they are let in response to sealed competitive bids. "Handyman" work is a different matter, of course.

Beyond that, in our opinion, a contractor who has acted as a consultant for a university in the design of a facility, the estimation of its costs, or the preparation of the specifications therefor, is disqualified from bidding on the resulting construction contract. The Texas Supreme Court, in Texas Highway Commission v. Texas Association of Steel Importers, Inc., supra, adopted the explanation of Texas competitive bidding statutes given in Sterrett v. Bell, supra, saying the purpose and intent of such statutes were well stated there. In part, the Sterrett court said competitive bidding "requires that all bidders be placed upon the same plane of equality." 240 S.W.2d at 520. It also said the purpose of such a statute, among other things, was to "prevent favoritism," and "[t]hat there can be no competitive bidding in a legal sense where the terms of the letting of the contract prevent or restrict competition, [or] favor a contractor or materialman. . . ." Id.

A potential bidder is undoubtedly put in a favored position over other potential bidders if he drafts the specifications of the job to be let or participates in the design and cost-estimating decisions of the owner. All bidders are not placed on the same plane of equality. In our opinion, such dual activities create a conflict of interests as well. It is unnecessary to determine whether one employed by a university as an independent consultant is within the meaning of "employee" as used in article 6252-9b, V.T.C.S. (setting out standards of conduct for state employees and officers but exacting no penalty for noncompliance in most cases), for if the consultant is not within the letter, he is at least within the spirit of that statute, which announces a policy that

> no state officer or state employee shall have any
> interest, financial or otherwise, direct or
> indirect, or engage in any business transaction or
> professional activity or incur any obligation of
> any nature which is in substantial conflict with

the proper discharge of his duties in the public interest.

V.T.C.S. art. 6252-9b, §1; see also §§2(7), 2(8)(B), 8.

## S U M M A R Y

Although offers for consultant services with respect to construction projects may be solicited by a university based upon a general project description before plans and specifications are complete, bids for construction of the project may not be so solicited. Consultant services contracts may be awarded upon negotiated fee proposals made with reference to a percentage of projected or estimated costs, but building contracts for construction of a facility must be let by the university upon competitive bids received by its governing body. Contracts for a guaranteed maximum price can be the subject of such competitive bids so long as the contingincies upon which the maximum price will be reduced are properly specified and advertised to potential bidders. But the construction of permanent improvements at an institution of higher education, or a portion of such work, cannot be undertaken on a "time and materials" or negotiated basis, and a consultant for the university who participates in the design, estimation of costs, or preparation of the plans and specification of a project is disqualified from bidding on the resulting construction contract therefor.

Very truly yours

J I M   M A T T O X
Attorney General of Texas

TOM GREEN
First Assistant Attorney General

DAVID R. RICHARDS
Executive Assistant Attorney General

RICK GILPIN
Chairman, Opinion Committee

p. 1254

Prepared by Bruce Youngblood
Assistant Attorney General

APPROVED:
OPINION COMMITTEE

Rick Gilpin, Chairman
Colin Carl
Susan Garrison
Tony Guillory
Jim Moellinger
Jennifer Riggs
Bruce Youngblood